UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 14-10358-RGS

PAULINA KESKINIDIS

v.

UNIVERSITY OF MASSACHUSETTS BOSTON and
RICHARD KESSELI, Individually

MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

July 17, 2015

STEARNS, D. J.

In her Complaint, plaintiff Paulina Keskinidis, a former student at the University of Massachusetts Boston (University), alleges that Richard Kesseli, one of her professors, violated her rights under the Equal Protection Clause of the Fourteenth Amendment by subjecting her to sexual harassment (Count V). She also alleges that the University did not accommodate her Attention Deficit Hyperactivity Disorder (ADHD) in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 (Counts I and II), and subjected her to a hostile learning environment in violation of Title IX of the Educational Amendments, 20 U.S.C. § 1681, by failing to conduct a timely investigation

of her allegations of sexual harassment against Professor Kesseli (Count IV).[1] Defendants move for summary judgment on Counts IV and V of Keskinidis's Complaint.

BACKGROUND

Keskinidis enrolled in 2011 as a biology major in the University's College of Mathematics and Science. Compl. ¶ 6. In May of 2011, she was evaluated at the Department of Neurology at Beth Israel Deaconess Medical Center and diagnosed with ADHD. Compl. ¶¶ 7-8. In September of 2012, she enrolled in Biology 252-Genetics, a course taught by Kesseli. Compl. ¶ 22. Keskinidis failed the course, which she attributes to the University's refusal to accommodate her ADHD. Compl. ¶ 31. In September of 2013, Keskinidis re-enrolled in the same course, again under Kesseli's tutelage. She received failing grades on the three exams given during the semester (14 out of 100, 15 out of 100, and 34 out of 100). Compl. ¶¶ 35, 38-39; Statement of Material Facts (SOF) ¶ 8. On the first and second exams, Kesseli made a written recommendation that Keskinidis obtain special tutoring. SOF ¶¶ 10-11. When Keskinidis went to Kesseli's office following the third exam, Kesseli iterated the tutoring recommendation (although he did not meet with Keskinidis because he was already meeting with another student). SOF ¶ 12.

---

[1] Keskinidis assented to the dismissal of Count III. Dkt. #14.

Keskinidis did not meet with a tutor, but instead sought the advice of a teaching assistant. SOF ¶ 71; Pl.'s Resp. to SOF (PSOF) ¶ 77. On January 6, 2014, Keskinidis presented to Kesseli at his faculty office to inquire about her poor grade on the final exam. Compl. ¶ 42. Kesseli "ushered her into his office and shut the door," and then engaged in a "closed-door conversation" that lasted for more than three hours. Compl. ¶¶ 42-43. Keskinidis alleges that during the discussion, Kesseli stared "up and down her body and lick[ed] his lips in a suggestive manner," that he "was stalling to keep her from leaving his office," that he "commented several times 'Let's see what we can do,'" and said that he knew she was "'desperate for a good grade,'" that he, at one point, "appeared to be rubbing his hand around his groin area in an up-and-down motion for approximately one minute while staring at [her]," that he commented "'I led you to the lake and you could have drank from it if you wanted to, but you didn't. You didn't drink from it,'" and then later questioned the color of her eyes. Compl. ¶¶ 44-46, 48, 51. Keskinidis interpreted Kesseli's comments and actions to insinuate "that she could improve her grade by engaging in sexual activity with him," leading her to believe that "her grades [had been] manipulated by . . . Kesseli to place her in a position where she would be vulnerable to his sexual advances." Compl. ¶¶ 49, 53.

On January 7, 2014, Keskinidis complained about Kesseli's conduct to the Dean of Student Affairs and to the Department of Inclusion and Diversity. The Dean assured her that her complaint would be investigated and her grade independently reviewed. Compl. ¶¶ 54-55. Because of the low grade Keskinidis received from Kesseli, her cumulative grade point average (GPA) dropped to 1.99, which fell below the University's requirement of a 2.0 GPA for continued enrollment. Compl. ¶ 56. On January 14, 2014, she was informed by the University that she would not be permitted to re-enroll. Compl. ¶ 58. Keskinidis was a senior and lacking the four courses that she needed to graduate. Compl. ¶ 59. Keskinidis filed the instant Complaint on February 19, 2014.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphases in original). A material fact is one which has the "potential to affect the outcome of the suit under applicable

law." *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993). In assessing the genuineness of a material dispute, the facts are to be "viewed in the light most flattering to the party opposing the motion." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995).

*Count V: The Claim against Kesseli*

Keskinidis alleges that Kesseli's alleged sexual harassment is actionable under section 1983 as a violation of the Equal Protection Clause of the Fourteenth Amendment. The First Circuit has endorsed in principle the legal theory underlying Keskinidis's claim. *See Pontarelli v. Stone*, 930 F.2d 104, 113-114 (1st Cir. 1991); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 901 (1st Cir. 1988); *accord Annis v. Cnty. of Westchester, N.Y.*, 36 F.3d 251, 254 (2d Cir. 1994). In bringing such a claim, a plaintiff is required to make out a prima facie case in conformity with the standards that apply to an action for employment discrimination brought under Title VII. *Lipsett*, 864 F.2d at 896-897; *Wright v. Rolette Cnty.*, 417 F.3d 879, 884 (8th Cir. 2005); *Cross v. Alabama*, 49 F.3d 1490, 1508 (11th Cir. 1995); *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994); *Bohen v. City of E. Chicago, Ind.*, 799 F.2d 1180, 1186 (7th Cir. 1986).

A sexual harassment claim may be based either on an allegation of a *quid pro quo* offer or evidence that a plaintiff was compelled to endure a

5

pervasively hostile working or educational environment.  Keskinidis argues both theories in the alternative.  To establish a prima facie case of *quid pro quo* sexual harassment, a plaintiff must show that she (1) "was subject to unwelcome sexual advances by a . . . teacher," and (2) "her reaction to these advances affected tangible aspects of . . . her . . . educational training." *Lipsett*, 864 F.2d at 898.  To make out a prima facie case of sexual harassment under a hostile environment theory, a plaintiff must prove that (1) she is a member of a protected class, (2) that she was subject to unwelcome sexual harassment, (3) that the harassment was based on sex, (4) that the harassment was sufficiently severe or pervasive so as to alter the terms or conditions of the plaintiff's employment, (5) that the conduct complained of was both objectively and subjectively offensive, and (6) that some basis for employer liability has been established.  *Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525, 540 (1st Cir. 1995); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-73 (1986). When translated into a Title IX education context, the plaintiff must show that the unwelcome sexual advances were "so 'severe or pervasive' that [they] altered . . . her . . . educational environment." *Lipsett*, 864 F.2d at 898 (citation omitted).  The existence of a hostile environment is a matter calling for both an objective

and a subjective evaluation. *Harris v. Forklift Sys, Inc.,* 510 U.S. 17, 21 (1993).

"Subject to some policing at the outer bounds, it is for the jury to weigh [the] factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her [education]." *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 19 (1st Cir. 2002) (internal quotation marks and citation omitted). However, "'[e]ven in . . . discrimination cases where elusive concepts such as motive or intent are at issue,' summary judgment is appropriate if the non-moving party rests 'merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003) (citation omitted). This case falls within the borderland identified in *Marrero*. Keskinidis has simply failed to present evidence that would allow a reasonable jury to conclude either that Kesseli's actions affected a "tangible aspect" of her educational training or that there is an objective basis for finding that she was subjected to "severe or pervasive" sexual harassment.

Keskinidis's *quid pro quo* claim is based on the conjecture that Kesseli deliberately gave her failing marks on her exams with the expectation that that Keskinidis would eventually feel pressured to offer sexual favors in exchange for a higher grade. Crediting Keskindis's subjective belief that her

three-hour counseling session with Kesseli ultimately revealed itself as an awkward sexual advance, Keskinidis's allegations fail to establish the second element of her prima facie case, that "her reaction to these advances affected tangible aspects of . . . her . . . educational training." *Lipsett*, 864 F.2d at 898).   At the very least, Keskinidis would have to produce some evidence supporting her contention that the grades she received from Kesseli were unfair.   Keskinidis does not describe the exam questions at issue, or explain why her answers were inappropriately graded.   Keskinidis's only contribution on this point is her assertion that when she received a final course grade of D- she was surprised, because "I thought that I had done well on the final, also, so I – I – or at least a little better than – than this."   Defs.' Ex. A at 238 (Keskinidis Dep.).   It is undisputed that in response to Keskindis's complaint about Kesseli, the University had her final exam re-graded by another professor in the same department.   She reported that, if anything, the grade that Kesseli gave should have been lower.   SOF ¶ 59.[2] Keskinidis's subjective feeling that she deserved a better grade on her final

---

[2] Keskinidis's only factually grounded dispute with her final grade is the suggestion that two of her answers on the final exam were potentially misunderstood by the second professor and possibly incorrectly marked as "wrong" during the re-grading.   PSOF ¶¶ 59, 68 and 72.   She does not offer any evidence of what was "right" about her answers, or the effect, if any, that a "right" mark on the two questions would have had on her final grade.

exam fails to raise a jury question regarding a theory of *quid pro quo* sexual harassment that depends on proof of an elaborate scheme of protracted behavioral manipulation.

In support of her alternative hostile environment theory, Keskinidis alleges that she has come to realize that Kesseli's inappropriate behavior pre-dated the counseling session on January 6, 2014.  She alleges that Kesseli would refer to her as his "special student," order her to sit in the front row of the classroom, and wink at her, and on one unspecified occasion when she sought him out, told her that, "I marked these wrong so that you can come into my office and go over it with me." She also maintains that on another occasion when she waited to see him at his office, he encouraged her to meet with a tutor instead, so that he could meet alone with a female student who Keskinidis felt was inappropriately dressed.   Def. Ex. A at 168-172 (Keskinidis Dep.).

When Keskinidis made these accusations for the first time during her deposition, she was specifically asked, "Had [Kesseli] ever done anything in his meetings with you that made you uncomfortable before the meeting on January 6th?" to which Keskinidis replied, "Not really, no."  This was followed by the question, "Had [Kesseli] ever written or done anything else

that made you uncomfortable with respect to you (sic) before the meeting on January 6th?"  Keskinidis again replied "No."  *Id.* at 172.

Having disavowed any hostile content in Kesseli's interactions with her prior to the January 6 meeting, Keskinidis's case boils down to allegations she makes about Kasseli's conduct during that meeting.  She complains that Kesseli was in his office in anticipation of her visit; that he invited her into his office without hesitation, closed the door behind her, and sat next to her; and that when asked for explanations of her marks responded with the statement, "You just don't get it." At one point during their three-hour meeting, Kesseli told her that, "I led you to the lake and you could have drank from it if you wanted to, but you didn't;" that Kesseli stared at her with a smirk and licked his lips; that at some point during the meeting he reportedly "began rubbing his groin region . . . with his leg up" for a minute or so; that at one point he looked into her eyes and asked what color they were; and finally, that on five or six occasions when she attempted to leave, he stopped her, implying that perhaps something could be done about her grade.  Opp'n at 4-7.

Assuming the truth of these allegations, Kesseli's actions and statements during this extended meeting, in their totality, might fairly be characterized as insensitive – even uncouth – and capable of being

misinterpreted as conveying sexual innuendos, particularly given Kesseli's role as an authority figure in Keskinidis's eyes.  However, to make out a hostile environment claim, a plaintiff must show that the harassment at issue was "severe or pervasive." "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive," does not qualify as actionable sexual harassment.  *Harris*, 510 U.S. at 21; *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) ("The prohibition of harassment on the basis of sex . . . forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment.");  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) ("[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment. . . . For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" (citation omitted)).  There are several factors that define the existence of a hostile environment in the sense the term is used in Title VII and Title IX litigation: "'[T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [a student's] . . . performance.'"

*Bhatti v. Trs. of Boston Univ.*, 659 F.3d 64, 73-74 (1st Cir. 2011), quoting *Vega-Colon v. Wyeth Pharm.*, 625 F.3d 22, 32 (1st Cir. 2010).

In the appropriate legal context, the offensive acts attributed to Kesseli simply do not add up to behavior "sufficiently severe or pervasive" to have altered the conditions of Keskinidis's educational environment or performance. *Meritor*, 477 U.S. at 67.   The conduct in question was a one-time event, highly ambiguous in its content, and involving nothing that could be reasonably construed as a physical threat or an explicit demand for sex. Most compelling, there is no evidence that what happened at the meeting interfered in any way with Keskinidis's educational performance.  Although following the meeting, Keskinidis was told that she would not be permitted to re-enroll at the University, there is no causal connection between the two events.   The die in this respect had been cast long before January 6 by Keskindis's persistently poor overall academic performance (which was not confined to her one course with Kesseli).   Keskindis's educational environment "never reached the level of abuse.  And where [an educational environment] falls short of that 'abusive' high-water-mark, it cannot sustain a hostile-[educational]-environment claim." *Bhatti*, 659 F.3d at 74.  So it is here.

**Count IV: Title IX Claim against the University**

Because Keskinidis has not made out a triable claim of sexual harassment against Kesseli, her claim that the University acted with deliberate indifference to her complaint of discrimination also fails.[3] *Cf. City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

### ORDER

For the foregoing reasons, defendants' motion to dismiss Counts IV and V of the Complaint is <u>ALLOWED</u>.  Trial will proceed against the University on the disability counts (the triability of which has not been challenged by the University).

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

[3] The University's alleged response in any event seems appropriate on the undisputed facts. Various University administrators met with Keskinidis to discuss her allegations, SOF ¶¶ 30-31; an official at the University trained to conduct "investigations related to employment law compliance" conducted an investigation, including arranging to have her exam re-graded, SOF ¶¶ 33-59; this official prepared a final report of the investigation and sent it to the University's chief diversity officer for review, SOF ¶¶ 66-71; Defs.' Ex. R; and the University sent to Keskinidis a letter reporting the results of the investigation on March 17, 2014.  SOF ¶ 72; Defs.' Ex. M.